340 F.2d 34
 Hubert REID, Libelant-Appellee,
v.
QUEBEC PAPER SALES & TRANSPORTATION COMPANY, Limited and
Donnacona Paper Company, Limited,
Respondents-Appellants, v. WILLIAM
SPENCER & SON CORP.,
Respondent-Impleaded-
Appellant.
 No. 26, Docket 28880.
 United States Court of Appeals Second Circuit.
 Argued Sept. 29, 1964.
Decided Jan. 5, 1965.
 
 Paul S. Edelman, New York City (Frederic D. Walker, New York City, on the brief, Kreindler & Kreindler, New York City, of counsel), for libelant-appellee.
 Victor S. Cichanowicz, New York City (Cichanowicz & Callan, New York City, on the brief), for respondents-appellants.
 Walter A. Donnelly, New York City (DeWitt, Nast & Diskin, New York City, on the brief), for respondent-impleaded-appellant.
 Before FRIENDLY, KAUFMAN and MARSHALL, Circuit Judges.
 MARSHALL, Circuit Judge:
 
 
 1
 Reid, and other fellow stevedores in the direct employ of an independent stevedoring company, were loading and stowing general cargo in the hold of Quebec's ship. A rest period was called. Young, one of Reid's co-workers, placed a portable aluminum ladder in the hold to enable the crew to come up to the main deck, and Reid remained standing on the cargo in the hold. The ladder weighed only 50 pounds, it was 30 to 35 feet in length and 5 or 6 feet extended above the main deck; the wind was approximately 14 miles per hour, and the boat was moving on the waves' swell; the ship had an uneven keel; and the ladder did not rest perpendicularly on the cargo, for if there were rubber legs, they were not working effectively. Young held the ladder in place, as it was not tied down or secured in any other way. But he left it unattended in order to get a garment for one of the men and then the ladder slid along the hatch coaming, upon which the upper part rested, and fell into the hold, hitting Reid on the head.
 
 
 2
 The principal question raised on this appeal is whether the District Court erred in holding Quebec liable for the resultant injuries on the theory that the shipowner's warranty of seaworthiness was breached. We think not. Under the circumstances it was necessary for the ladder to be secured in some fashion when it was being used, and unless it was so secured, it was unfit for its intended use. An unsecured and dangling ladder under the conditions existing at the time of the accident posed a serious threat to the safety of those standing below in the hold, regardless of whether the shipowner knew it was unsecured and regardless of how quickly this threat materialized. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960).
 
 
 3
 Given the weight of the ladder, that almost 1/6 extended above the deck and was exposed to a 14 miles per hour wind, that the ship was moving on the waves' swell and had an uneven keel, and that the ladder was not standing perpendicularly, it was imperative that the ladder be secured in some fashion. The Safety and Health Regulations for Longshoring promulgated by the U.S. Department of Labor and interpreted by some courts to establish a standard of safety, Provenza v. American Export Lines, Inc., 324 F.2d 660 (4 Cir. 1963), cert. denied, 376 U.S. 952, 84 S.Ct. 970, 11 L.Ed.2d 971 (1964), underscore this need, for 9.25[1] requires that portable ladders be 'suitably secured against shifting or slipping' and this requirement is not conditioned on the perilous combination of circumstances present in this case. Of course, this does not mean that it would have only been proper to use the single fixed or attached ladder in the hold (which at the time was obstructed), nor are we suggesting that this portable ladder be made any less portable. There are, however, many ways in which a portable ladder could be secured when it is in use that would not destroy its portable quality; it could have been non-permanently tied, lashed, chained or fastened to the hatch coaming, upon which the top part rested or, as was done in this case, a crew member or a stevedore could have been assigned to hold it in place. If the ladder was secured in any of these ways, and remained so secured, no condition of unseaworthiness would have arisen.
 
 
 4
 Moreover, Quebec had the ultimate obligation to see that the ladder was secured when it was used under these conditions, in much the same way that it is the duty of the shipowner to see that all of the ship's equipment is reasonably fit for its intended use. Although two recent Third Circuit cases, Ferrante v. Swedish American Lines, 331 F.2d 571 (3 Cir.), petition for cert. dismissed pursuant to Rule 60, 85 S.Ct. 10 (1964) and Thompson v. Calmar Steamship Corp., 331 F.2d 657 (3 Cir.), cert. denied, 85 S.Ct. 259 (1964), have gone so far as to hold that the improper use by stevedores of proper equipment may render the ship unseaworthy, see also Morales v. City of Galveston, 370 U.S. 165, 170, 171, 82 S.Ct. 1226, 8 L.Ed.2d 412 (1962); Scott v. Isbrandtsen Co., Inc., 327 F.2d 113, 125-126 (4 Cir. 1964), we are not presented with such a situation. For here the ladder was not a suitable means of egress from the hold, under the existing circumstances, unless it was secured in some fashion, either by some mechanical device or by a workman holding it in place. If, for example, this ladder were secured by a chain provided by Quebec and fastened by a crew member, and if the chain had failed to hold the ladder either because of a break in the chain, or an error in fastening it, and the ladder fell, Quebec could be held liable under its warranty of seaworthiness. The fact that Quebec chose to have the ladder secured by having a workman hold it in place, that Quebec delegated the entire task of securing the ladder to those using it, which happened to be in this case stevedores not in its direct employ, and that Quebec acted reasonably in so delegating this task, does not relieve it of this responsibility. See Grillea v. United States, 232 F.2d 919 (2 Cir. 1956); see also Rogers v. United States Lines, 347 U.S. 984, 74 S.Ct. 849, 98 L.Ed. 1120 (1954) and Alaska Steamship Co., Inc. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954) (to the effect that when a stevedore brings aboard the ship defective equipment which causes an accident the ship is made unseaworthy). The shipowner could hold the delegate liable for any failure to perform the delegated tasks properly, if and when the shipowner is called upon to answer for injuries arising out of the delegate's negligent performance, and this is one further reason why the shipowner's decision to delegate the task of securing the ladder does not preclude liability under the warranty of seaworthiness.
 
 
 5
 Primarily under the force of Judge Learned Hand's pen in Grillea v. United States, 232 F.2d 919 (2 Cir. 1956), some lower federal courts have refused to hold a shipowner liable for a breach of the warranty of seaworthiness when the accident was attributed solely to an act of negligence of a worker that the court decided had not yet made the workplace unsafe.[2] A distinction emerged between an accident caused by an act of negligence, and one caused by an unsafe condition of the workplace, which in turn may, of course, be due to an act of negligence; only in the latter case would the warranty of seaworthiness be held to be breached. One does not have to be unduly cynical to look askance at this distinction, for every act of negligence, no matter how short-lived, creates an unsafe condition for those exposed to it. Under the rubric of a 'breach of the warranty of seaworthiness' courts had held shipowners responsible for accidents resulting from unsafe conditions of the workplace, regardless of whether the shipowner had actual or constructive notice or the means or opportunity of correcting them, and, if all assessments of fault are to be truly irrelevant, it is not at all clear why this responsibility does not encompass any conduct at the workplace which creates a threat to the safety of the other workmen.[3]
 
 
 6
 But we need not reexamine the Grillea doctrine nor need we become concerned with the metaphysical inquiry required by that doctrine of determining whether Young's act of negligence had 'terminated' or 'come to rest.'[4] The trier of fact below, the District Judge, specifically found that Young's negligence in leaving the ladder unattended was only one of the causes of the accident. This finding of fact is not clearly erroneous and therefore should not be disturbed, McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954). Although the ladder probably would not have fallen if Young continued holding it, the trier of fact was entitled to find that the ladder would not have fallen, even if Young had not continued to hold it, but for the wind, the ship's movement on the swells, its uneven keel and the fact that the ladder was not standing perpendicularly. This is sufficient to take our case out of the Grillea doctrine,[5] where the sole cause of the accident must be the negligence of a co-worker or the libelant himself. See, e.g., Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Shenker v. United States, 322 F.2d 622 (2 Cir. 1963), cert. denied, sub nom., American Stevedores v. Shenker, 376 U.S. 907, 84 S.Ct. 659, 11 L.Ed.2d 606 (1964) (negligence contributing to the accident was that of the libelant). Any extension of the Grillea doctrine, if not the doctrine itself, might well become the Trojan horse of the warranty of seaworthiness.
 
 
 7
 While the District Court's application of the warranty of seaworthiness is the principal issue raised on this appeal, it is by no means the only one. Libelant's Exhibit 6, which purported to be a statement made by the ship's captain, was clearly hearsay and did not come within any of the established exceptions to the hearsay rule. Yet the District Judge's error in admitting this statement does not warrant reversal. The only finding which rested on information contained in this statement exclusively was that the captain issued orders for the crew to hold the portable ladder when it was used. But neither the libelant's right to recover nor the shipowner's right to indemnification hinged on this finding. Regardless of the captain's instructions, the facts established by competent testimony, speak for themselves. It was also objected that the District Judge erred in accepting the testimony of a Dr. Kaplan, allegedly Reid's examining but not his treating physician, as to Reid's complaints of past headaches. However, the testimony was not introduced to establish the fact that Reid had experienced these headaches, but rather to show the basis of the doctor's diagnosis. Especially since the judge was the trier of fact, we can presume that this testimony was confined to this non-hear-say purpose. Appellant's objection that libelant's award was excessive is equally unpersuasive and we so hold. We therefore affirm that part of the decree below awarding libelant damages against Quebec under the theory that Quebec breached its warranty of seaworthiness.
 
 
 8
 The District Judge also found that William Spencer & Son Corp. (Spencer), Young's and Reid's employer, had breached its warranty of workmanlike service and on the basis of that finding obliged Spencer to indemnify Quebec for the amount of the libelant's award and for its attorney fees and disbursements incurred up to that point. In its notice of appeal of March 19, 1964 Spencer indicated that it would appeal from this part of the decree, but by the time its brief was filed on May 19, 1964 Spencer acknowledged its obligation to indemnify Quebec for the amount of the libelant's award and for the attorney costs and disbursements at the trial level. The libelant's original brief and Spencer's reply brief were filed by July 10, 1964 and although Quebec filed a notice of appeal on March 24, 1964 Quebec was not heard from again until September 18, 1964, eleven days before the scheduled oral argument. At that time Quebec filed a motion seeking permission to file a late brief and, over the strenuous objections of Spencer, we granted that motion. And we are now urged to order Spencer to pay for all Quebec's costs and counsel fees on this appeal. This we refuse to do.
 
 
 9
 Misurella v. Isthmian Lines, Inc., 328 F.2d 40 (2 Cir. 1964) and Calderone v. Naviera Vacuba S/A, 328 F.2d 578 (2 Cir. 1964) establish that the costs on appeal are not included within the stevedoring company's indemnity obligation when the only 'actual contest' on appeal involves the stevedoring company's obligation to indemnify the shipowner for the libelant's award. See also Paliaga v. Luckenbach Steamship Co., 301 F.2d 403, 409 n. 1 (2 Cir. 1962); Holley v. The Manfred Stansfield, 186 F.Supp. 805 (E.D.Va.1960). Hence, even if Quebec could establish that up to May 19, 1964 it incurred counsel fees in preparation for its defense on appeal of that part of the judgment below requiring Spencer to indemnify it, Quebec is not entitled to those costs. Nor is Quebec entitled to any other costs on this appeal. By no stretch of the imagination could we find a causal link, resembling that in Massa v. C.A. Venezuelan Navigacion, 332 F.2d 779 (2 Cir. 1964), cert. denied, 85 S.Ct. 262 (1964), between Young's negligence in leaving the ladder unattended, the breach of the warranty of workmanlike service, and Quebec's effort in filing a brief contesting Reid's award. Unlike Nicroli v. Den Norske Afrika-Og Australielinie, 332 F.2d 651 (2 Cir. 1964), in this appeal the libelant was entirely defensive, not seeking to increase the amount of his award and Spencer, the stevedoring company, did not contest its obligation to indemnify the shipowner, Quebec. Thus the principal, if not the only interest to be furthered by pursuing this appeal was that of Spencer. Spencer strenuously resisted the belated effort of Quebec to come to its assistance and although Quebec was able to overcome this resistance and impose its not very helpful services, it would be grossly unfair for us to order this unwilling and ungrateful benefactor to pay for these services.
 
 
 10
 Affirmed, and request by respondent-shipowner for costs on appeal from impleaded-stevedoring company denied.
 
 FRIENDLY, Circuit Judge (dissenting):
 
 11
 This is one more case where the unloading of a vessel was turned over to a stevedore whose negligence injured a longshoreman, and a court goes to unrealistic lengths to find unseaworthiness, knowing full well that the ship will escape scot-free and that, as is strikingly illustrated by the final point in the opinion, her only role is as a conduit to impose on the stevedore a liability exceeding what Congress made exclusive by 5 of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. 905. If compensation to longshoremen needs to be liberalized, Congress should say so; in the absence of controlling Supreme Court decisions, not present here, inferior federal courts should bend their efforts to effectuating the Congressional purpose rather than to its further erosion. See Lucas, Flood Tide: Some Irrelevant History of the Admiralty, 1964 Supreme Court Review 249, 260.
 
 
 12
 Nothing in the record, in the findings, or in common sense tells me that a 30-35 foot portable ladder weighing 50 pounds is too light for its purpose. I should suppose one requisite of a portable ladder is that it be portable; if it weighed too much for convenient carriage, the ship would risk being cast as unseaworthy on that score. The photographs offered by libelant showed that the ladder had rubber feet; there is nothing to negate this or to prove that they were worn or otherwise defective, or that 'they were not working effectively'-- save in the sense that in fact they did not prevent the unattended ladder from falling. Neither do I see any support for a view that although the ladder may have been all right in general, conditions made it unsuitable at the time of Reid's injury. The record does not disclose the exact length of the ship but on one of any size the departure from level caused by her being 4 feet down at the stern-- a rather common phenomenon-- would be small indeed, and a wind of 14 miles per hour, not even a 'fresh wind' on the Weather Bureau's scale, scarcely creates a situation of peril.
 
 
 13
 If there were any requirement for shackling portable ladders, the ship's obligation would be to have shackles available, not to see that they were used by those whom she has hired to load her, see Ezekiel v. Volusia S.S. Co., 297 F.2d 215, 91 A.L.R.2d 1013 (2 Cir. 1961), cert. denied, Pinto v. States Marine Corporation of Delaware, 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962); and there is no evidence that the ship or the stevedore did not have whatever ropes or chains were needed if the stevedore wanted them. However, I need not rely on that point, since my brothers concede that a portable ladder can be perfectly well secured by human means if the humans stay on the job, and the captain, as the judge found, had instructed that the ladder was never to be used without someone holding it. The conclusion of unseaworthiness thus rests on the unsafe condition, a few seconds in duration, created by a co-worker's leaving the ladder momentarily unattended, in breach of the captain's instructions. This is a perfect case for following the distinction drawn by Judge Learned Hand in Grillea v. United States, 232 F.2d 919, 922-923 (2 Cir. 1956) and our decision in Puddu v. Royal Netherlands S.S. Co., 303 F.2d 752 (2 Cir.), cert. denied, 371 U.S. 840, 83 S.Ct. 67, 9 L.Ed.2d 75 (1962)-- neither of which has been cast in doubt by any decision of the Supreme Court. True, there can be no certainty as to the location of the 'line between situations in which the defect is only an incident in a continuous operation, and those in which some intermediate step is to be taken as making the ship unseaworthy,' 232 F.2d at 922; and 'logical coordinates for fixing' it 'are entirely lacking,' 303 F.2d at 757 (concurring opinion of Judge Hays). But courts ought not be astute to push the line in a direction which frustrates the purpose of Congress to establish an absolute but limited liability of stevedores to their employees-- the legal regime applied to the great bulk of American working men-- and gives a longshoreman, if his injury happens to occur on shipboard or from some contact with the ship, an additional unlimited liability for what any layman would readily identify as simply a negligent act of the employer.
 
 
 14
 Reid's libel should have been dismissed and he should be left with the remedy against his employer that Congress thought appropriate.
 
 
 
 [1]
 9.25 Ladders in Cargo Spaces
 (a) There shall be at least one safe and accessible ladder for each gang working in a hatch. However, no more than two such ladders are required in any hatch.
 (b) When any fixed ladder is visibly unsafe, the employer shall prohibit its use by employees.
 (c) Straight ladders of adequate strength and suitably secured against shifting or slipping shall be provided as necessary when fixed hold ladders do not meet the requirements of paragraph (a) of this section, except that when conditions are such that a straight ladder cannot be used, Jacob's ladders meeting the requirements of 9.22 may be used.
 (d) When cargo is stowed within four inches of the back of ladder rungs, the ladder shall be deemed 'unsafe' for the purpose of this section. 29 C.F.R. 1504.32. While these regulations are addressed to the stevedore's employer, 9.2 declares that it is not 'the intent of these regulations to relieve such owners, operators, agents or masters of vessels from responsibilities or duties now placed upon them by law, regulation or custom.' 29 C.F.R. 1504.2.
 
 
 [2]
 Puddu v. Royal Netherlands Steamship Co., 303 F.2d 752 (2 Cir.), cert. denied, 371 U.S. 840, 83 S.Ct. 67, 9 L.Ed.2d 75 (1962); Pinto v. States Marine Corp., 296 F.2d 1 (2 Cir. 1961), cert. denied, 369 U.S. 843, 82 S.Ct. 874, 7 L.Ed.2d 847 (1962); Spinelli v. Isthmian Steamship Co., 326 F.2d 870 (2 Cir.), cert. denied, 377 U.S. 935, 84 S.Ct. 1338, 12 L.Ed.2d 298, rehearing denied, 377 U.S. 1010, 84 S.Ct. 1912, 12 L.Ed.2d 1058 (1964); Billeci v. United States, 298 F.2d 703 (9 Cir. 1962); Rawson v. Calmar S.S.Corp., 304 F.2d 202 (9 Cir. 1962); Sullivan v. United States, 203 F.Supp. 496 (S.D.N.Y.1961); Beeler v. Alaska Aggregate Corp., 336 F.2d 108 (9 Cir. 1964). Contra, Ferrante v. Swedish American Lines, 331 F.2d 571 (3 Cir.), petition for cert. dismissed pursuant to rule 60, 85 S.Ct. 10 (1964); Thompson v. Calmar Steamship Corp., 331 F.2d 657 (3 Cir.), cert. denied, 85 S.Ct. 259 (1964); Scott v. Isbrandtsen Co., 327 F.2d 113 (4 Cir. 1964)
 
 
 [3]
 In Grillea, Judge Hand held that although the libelant and his fellow stevedores 'laid the wrong hatch cover over the 'pad-eye' only a short time before he fell, we think enough time had elapsed to result in unseaworthiness.' 232 F.2d at 922. But there was no explanation why the ship would be any less unseaworthy if the accident occurred the very instant the wrong hatch cover was placed over the 'pad-eye.' To be sure, there might be a rational explanation for denying recovery, under the theory of unseaworthiness, to the man in Judge Hays' hypothetical, Puddu v. Royal Netherlands Steamship Co., 303 F.2d 752, 757 (2 Cir.), cert. denied, 371 U.S. 840, 83 S.Ct. 67, 9 L.Ed.2d 75 (1962) (concurring opinion), who negligently puts his hand through a window, see Guarracino v. Luckenbach S.S. Co., 333 F.2d 646 (2 Cir. 1964), cert. denied, 85 S.Ct. 439 (1964) for there is some distinction between an accident caused by an unsafe condition at the work place and injuring oneself. But cf. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946) and Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953)
 
 
 [4]
 See, e.g., Billeci v. United States, 298 F.2d 703, 706 (9 Cir. 1962)
 
 
 [5]
 One of the Grillea progeny, Beeler v. Foss Launch & Tug Co., 224 F.Supp. 814 (D.Oregon 1963) involved the negligent failure of a longshoreman to hold a ladder in place as a fellow workman was in the process of descending on the ladder. Recovery was denied on the unseaworthiness theory on the ground that 'this was not a case in which the negligent acts which created the unsafe condition terminated.' Id. at 815. It is obvious that under the Grillea doctrine, everything turns on what the court or trier of fact chooses as the relevant negligent act, e.g., 'taking his hands off the ladder,' or 'leaving the ladder unsecured,' for the 'termination points' of these acts vary
 On appeal, sub nom. Beeler v. Alaska Aggregate Corp., 336 F.2d 108 (9 Cir. 1964), the lower court was reversed and liability imposed on the theory of unseaworthiness. The Court of Appeals held that the negligent relevant act was 'failing to act prior to the accident by stepping forward to hold or watch the ladder' and that 'their negligence had come to rest before the ladder fell.' Hence, it would seem appellee could argue that even under the Grillea doctrine liability for unseaworthiness could be imposed, on the ground that Young's act of negligence was his 'failure to act prior to the accident by stepping forward to hold or watch the ladder' and that 'this negligence had come to rest before the ladder fell.'